Present:  All the Justices

NORMA SAWYER, ADMINISTRATRIX OF THE
ESTATE OF NORMAN LEE PLOGGER, DECEASED
                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 011741              June 7, 2002

CATHY COMERCI

            FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
                   George E. Honts, III, Judge

     In this appeal of a judgment entered in favor of a

physician in a medical negligence action, we consider whether

the circuit court erred in granting a contributory negligence

instruction, whether the evidence was sufficient to support

the granting of a jury instruction on mitigation of damages,

and whether the circuit court erred in limiting the scope of

the plaintiff's cross-examination of the defendant's expert

witness.

                              I.

     Plaintiff, Norma J. Sawyer, administrator of the estate

of Norman Lee Plogger, filed a motion for judgment against

Cathy Comerci, D.O., and Stonewall Jackson Hospital.  She

alleged that the defendants breached certain duties owed to

the decedent, Norman Plogger, and that their acts and

omissions were a proximate cause of his death.  The defendants

filed grounds of defense and denied any breach of duties owed

to Mr. Plogger.

     At the beginning of a jury trial, the plaintiff took a

voluntary nonsuit of her action against the hospital, and the

case proceeded against Dr. Comerci.  At the conclusion of the litigants' presentation of evidence, the jury was instructed, among other things, that it could consider whether Mr. Plogger was contributorially negligent.  The jury returned a verdict in favor of Dr. Comerci, and the plaintiff appeals.

                              II.

On the night of April 2, 1997, Norman Plogger, accompanied by his wife, Mary Plogger, went to the Stonewall Jackson Hospital emergency room.  Mr. Plogger sought help because he experienced continuous pain on the right side of his abdomen.

Dr. Comerci, the emergency room physician "on call" that night, evaluated Mr. Plogger, ordered certain laboratory tests, and performed an examination upon him.  Mr. Plogger informed Dr. Comerci that he "just didn't feel well; that he hadn't felt well for a while."  Mr. Plogger had seen his family physician a few days earlier, and his physician informed Mr. Plogger that he had a viral illness.  Mr. Plogger also informed an emergency room nurse that he "had right abdominal soreness."  Even though Mr. Plogger had experienced abdominal pains for several months before he went to Stonewall Jackson Hospital on April 2, 1997, he had not mentioned this pain to his physician, Dr. Thomas Hamilton.

Dr. Comerci concluded that Mr. Plogger should be admitted to the hospital as a patient because he had blood in his stool

                              2

and his white blood count was elevated.  The elevation in Mr. Plogger's white blood count led Dr. Comerci to believe that either "an inflammatory process or infection" was occurring in his body.

Dr. Comerci felt that a surgeon should evaluate Mr. Plogger, and she made a telephone call to Dr. Robert Irons, the hospital's "on call" surgeon, seeking such evaluation. Summarizing her conversation with Dr. Irons, Dr. Comerci stated:  "By my calling Dr. Irons, I would be calling him for an admission. . . .  I . . . call[ed] him because I needed him to see a patient for admission. . . .  But my calling him, it is because I need[ed] [Mr. Plogger] admitted, and I need[ed] the surgeon to come in and evaluate the patient."

Dr. Comerci informed Dr. Irons that Mr. Plogger "had blood in his stool" and that he "had a [gastrointestinal] bleed with an intermittent bowel obstruction probably being caused by a mass in his colon."  Dr. Comerci believed that Mr. Plogger needed surgical intervention to resolve the bleeding. Dr. Irons told Dr. Comerci that he did not believe that Mr. Plogger had "an acute surgical abdomen" and recommended that Dr. Comerci refer Mr. Plogger to Dr. Hamilton.  Dr. Comerci placed a telephone call to Dr. Hamilton.

When Dr. Comerci was discussing Mr. Plogger's condition with Dr. Irons, or after she had spoken with Dr. Irons, the emergency room nurses approached Dr. Comerci and informed her

3

that Mr. and Mrs. Plogger were about to leave the hospital again. The Ploggers had previously considered leaving the hospital before Dr. Comerci had spoken with Dr. Irons.

Dr. Comerci testified that when Mr. and Mrs. Plogger began to leave the second time, she asked them to wait. Dr. Comerci stated: "I went back in, I talked to them and told them to wait; that I was trying to get ahold of his doctor, Dr. Hamilton. And I talked with Dr. Hamilton and I told him that I had a problem, that I had a man that I felt needed to be admitted, and I told him why, but that the man didn't want to be admitted; apparently his wife had an appointment the next day in Roanoke; they wanted to get out of there; he was already on his way out of the door; Dr. Irons did not want to come in, and [he did not] want to come in and see this gentleman. And [Dr. Hamilton] said, I guess if he doesn't want to stay, I will just see him tomorrow. I said, I don't think you'll see him tomorrow, they're going to be in Roanoke. And he said, [f]ine, have him call the office tomorrow and I'll see him Monday."

Approximately 10:15 that night, Mr. and Mrs. Plogger left the hospital's emergency room. They had been in the emergency room since about 7:30 p.m. Dr. Comerci testified that Mrs. Plogger "had said all along, [Mr. Plogger] can't stay; I have an appointment in the morning; we have to go to Roanoke."

4

When Mr. Plogger was discharged from the hospital's emergency room at 10:15 p.m., Dr. Comerci tried to persuade him to remain. However, he refused to do so. Dr. Comerci recorded a statement on Mr. Plogger's progress notes after he had left the emergency room that stated, among other things: "Patient and especially the patient's wife are difficult to talk with and despite repeated explanation do not seem to understand the possibility of the seriousness of his condition; however, agree to follow up with Dr. Hamilton on Friday."

Generally, a patient who leaves a hospital against the advice of the physician is asked to sign a document, described as an "against medical advice form." Dr. Comerci did not think that this form was available in the emergency room at that time. Consequently, Mr. Plogger did not sign this form.

Mr. Plogger returned to the hospital's emergency room three days later on April 5, 1997 with complaints of a sore throat. Dr. Comerci evaluated his abdomen, examined his throat, and diagnosed his throat condition as either oral candidiasis or oral thrush, conditions unrelated to his abdominal complaints.

Even though the discharge instructions that Mr. Plogger received during his emergency room visit on April 2, 1997 directed him to meet with Dr. Hamilton on April 4, Mr. Plogger did not do so. When Dr. Comerci treated Mr. Plogger at the

emergency room on April 5, she "reiterated [that] he absolutely needed to follow up with his doctor on Monday [April 7] regarding [his] abdomen, and to come back if it was worse at all." Dr. Comerci "was still concerned" about Mr. Plogger's abdominal condition. According to Dr. Hamilton, Mr. Plogger failed to make an appointment to see him on April 4, 1997. Dr. Hamilton stated that "there is no record that [Mr. Plogger] made an appointment for any of those days after the 2nd of April."

On Monday morning, April 7, Mr. Plogger returned to the emergency room by ambulance. He was acutely short of breath, his skin was very pale, his lips were blue, and he was sweating. He was admitted to the hospital, where he died the following day.

The plaintiff presented evidence at trial that Dr. Comerci failed to comply with the applicable standard of care imposed upon a reasonably prudent emergency room physician when she treated Mr. Plogger on April 2, 5, and 7, 1997, and that her acts and omissions were proximate causes of his death. Dr. Comerci presented expert witness testimony that she complied with the standard of care and that Mr. Plogger's death was not caused by any act or omission by her.

### III.

The circuit court instructed the jury, over the plaintiff's objection, that it shall find its

"verdict for the defendant Dr. Comerci for the care she rendered to Mr. Plogger on April 2, 1997 if she has proved by the greater weight of the evidence that Mr. Plogger was contributor[ially] negligent concerning the events that occurred on April 2, 1997 and that this negligence was a proximate cause of Mr. Plogger's death."

The plaintiff contends that the circuit court erred in giving this jury instruction because Dr. Comerci failed to present sufficient evidence from which the jury could conclude that Mr. Plogger was guilty of contributory negligence. The alleged act of contributory negligence related to Dr. Comerci's contention that Mr. Plogger left the emergency room against her advice.

Responding, Dr. Comerci argues that she presented sufficient evidence to permit the jury to find that Mr. Plogger was guilty of contributory negligence because he left the emergency room even though she told him that he needed to be admitted. We disagree with Dr. Comerci.

The legal principles relevant to our resolution of this issue are familiar. Contributory negligence is an affirmative defense that is based on the objective standard whether a plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances. Ponirakis v. Choi, 262 Va. 119, 124, 546 S.E.2d 707, 710 (2001); Artrip v. E.E. Berry Equipment Co., 240 Va. 354, 358, 397 S.E.2d 821, 823-24 (1990).

7

"The essence of contributory negligence is carelessness." Ponirakis, 262 Va. at 124, 546 S.E.2d at 711; Artrip, 240 Va. at 358, 397 S.E.2d at 823-24. Whether a plaintiff is guilty of contributory negligence is generally a question of fact to be decided by the trier of fact. Ponirakis at 125, 546 S.E.2d at 711; Artrip, 240 Va. at 358, 397 S.E.2d at 823.

We have consistently held that the defendant has the burden of proving contributory negligence by the greater weight of the evidence. Id. This means that "the burden is upon the defendant to establish by a preponderance of the evidence such contributory negligence, unless it is disclosed by the plaintiff's evidence or can be fairly inferred from the circumstances of the case." Southern Railway v. May, 147 Va. 542, 552, 137 S.E. 493, 496 (1927).

Additionally, in order for contributory negligence to bar a plaintiff's recovery in a medical negligence action, the plaintiff's negligence must be concurrent with the defendant's negligence. Ponirakis, 262 Va. at 125, 546 S.E.2d at 711; Gravitt v. Ward, 258 Va. 330, 335, 518 S.E.2d 631, 634 (1999); Eiss v. Lillis, 233 Va. 545, 552, 357 S.E.2d 539, 543 (1987); Lawrence v. Wirth, 226 Va. 408, 412, 309 S.E.2d 315, 317 (1983). We have stated that "[i]n the medical malpractice context, this requirement means that the patient's negligent act must be contemporaneous with the main fact asserted as the

8

negligent act of the physician." Ponirakis, 262 Va. at 125, 546 S.E.2d at 711.

And, just as a plaintiff is required to establish a prima facie case of negligence, a defendant who relies upon the defense of contributory negligence must establish a prima facie case of the plaintiff's contributory negligence. Hence, a defendant who asserts a defense of contributory negligence is not entitled to a jury instruction on contributory negligence if that defendant only adduces a mere scintilla of evidence of the plaintiff's purported contributory negligence. A defendant who relies upon the defense of contributory negligence must prove that the plaintiff deviated from a standard of care and that the deviation was a proximate cause of damages. Consequently, more than a scintilla of evidence is necessary to establish each of the elements of contributory negligence before such instruction may be given to a jury.

We hold that Dr. Comerci was not entitled to a jury instruction on contributory negligence because she failed to establish a prima facie case that Mr. Plogger was guilty of contributory negligence. Even though Dr. Comerci consulted Dr. Hamilton and requested that he "come in to see" Mr. Plogger, no physician with admitting privileges told Mr. Plogger that he should be admitted as a patient to the hospital on April 2, 1997. Dr. Comerci did not make any

9

record in Mr. Plogger's medical chart that he should have been admitted to the hospital on April 2, 1997.

The record is devoid of any evidence that Mr. Plogger understood the severity of his condition and the consequences that might ensue if he were not admitted as a patient to the hospital. There is no evidence in this record that Dr. Comerci told Mr. Plogger that he could die if he did not receive medical treatment. And, even though Dr. Comerci claims that such evidence is found in the record, we conclude otherwise. Dr. Comerci relies upon the following question and answer in support of her contention that such evidence exists in this record:

> "[Question]: And certainly if you had told [Mr. Plogger] that he was in a life-or-death situation, I mean, he would have done – the guy came to the emergency room on a Wednesday night?

> "[Dr. Comerci]: No. I would think if the patient was in – and I had told him he was in a life-or-death situation and that I wanted him to be admitted, he would have been admitted. There seems to be a marked misunderstanding. He just didn't seem to comprehend, or actually Mr. Plogger seemed to comprehend, but Mrs. Plogger did not seem to comprehend."

This testimony does not permit us to hold that a jury could conclude that Dr. Comerci had explained to Mr. Plogger that if he chose to leave the hospital without being admitted as a patient, without resolution of his internal bleeding, he could die. Rather, this testimony is speculative and conjectural. We also observe that Dr. Irons, the surgeon whom

10

Dr. Comerci consulted, did not believe that Mr. Plogger needed to be admitted as a patient to the hospital and, therefore, we do not think that a jury should be permitted to infer that a layman could be guilty of contributory negligence because he left the emergency room under the facts and circumstances in this record.

IV.

The circuit court gave the following instruction to the jury, over the plaintiff's objection:

> "A patient who claims that he has been negligently treated by a physician has a duty to use ordinary care to avoid loss or minimize or lessen the resulting damage.
>
> "If the jury believes that Norman Plogger failed to use ordinary care to follow the instructions of Dr. Comerci to make an appointment with and see his family physician, his estate may not recover for any portion of the harm which, by such care, could have been avoided."

The plaintiff contends that there was insufficient evidence to support this instruction and, therefore, the circuit court erred by granting it. Responding, the defendant argues that there was evidence to support the instruction. We agree with the defendant.

We have held that a plaintiff has a duty to mitigate his damages. In the context of a medical negligence claim, we have stated that "a patient's neglect of his health following his physician's negligent treatment may be a reason for reducing damages, but does not bar all recovery." Lawrence,

11

226 Va. at 412, 309 S.E.2d at 317. Generally, whether a plaintiff acted reasonably to minimize his damage is a question for the jury. Id. at 413, 309 S.E.2d at 318.

We hold that there is sufficient evidence in this record that would permit the jury to find as a matter of fact that Mr. Plogger failed to mitigate his damages. For example, Dr. Donald G. Gregg, who testified on behalf of the plaintiff as an expert witness, stated that Mr. Plogger should have been admitted to the hospital, "[a]nd one of the ways to do that was to go see his family doctor as instructed and be evaluated" and that had he done so, "he would have survived." As we have already stated, when Mr. Plogger was discharged from the emergency room on April 2, 1997, he received instructions that directed him to make an appointment with his family physician. However, that physician, Dr. Hamilton, testified that Mr. Plogger failed to make any appointment to see him for treatment.

V.

At trial, Dr. David H. Lander qualified as an expert witness on the subject of emergency medicine. He testified on behalf of the defendant that, among other things, Dr. Comerci complied with the standard of care owed to Mr. Plogger. Lander had testified on behalf of Dr. Comerci in an unrelated lawsuit, and the plaintiff sought to cross-examine Lander to show that he had previously testified on Dr. Comerci's behalf

12

in an unrelated lawsuit and that he had received prior compensation from her. The circuit court refused to permit the plaintiff to elicit this testimony. The plaintiff asserts that she was entitled to cross-examine Lander on this subject and that the circuit court abused its discretion in prohibiting her from doing so.[*]

The defendant responds that the circuit court gave the plaintiff "appropriate latitude in cross-examining . . . Lander." The defendant says that the plaintiff was allowed to cross-examine Dr. Lander about the compensation he received for testifying in this case. Continuing, the defendant argues that the scope of cross-examination is a matter that rests within the discretion of the circuit court, and the circuit court may appropriately prohibit a particular line of impeachment if the court finds that the prejudicial effect of the impeachment outweighs the probative value of such testimony.

As the litigants correctly observe, a circuit court has discretion to limit the scope of cross-examination. Norfolk & Western Railroad Co. v. Sonney, 236 Va. 482, 488, 374 S.E.2d 71, 74 (1988); see Basham v. Terry, 199 Va. 817, 824, 102 S.E.2d 285, 290 (1958). That discretion, however, is not

---

[*] We find no merit in the defendant's argument that this Court cannot adjudicate this issue. The circuit court clearly articulated the reasons it relied upon to limit the scope of the plaintiff's cross-examination of Dr. Lander.

13

without limitations, and a litigant has a right to establish that a witness is biased.  We have stated:

> "The bias of a witness, like prejudice and relationship, is not a collateral matter.  The bias of a witness is always a relevant subject of inquiry when confined to ascertaining previous relationship, feeling and conduct of the witness . . . .  [O]n cross-examination great latitude is allowed and . . . the general rule is that anything tending to show the bias on the part of a witness may be drawn out."

Henning v. Thomas, 235 Va. 181, 188, 366 S.E.2d 109, 113 (1988) (quoting Henson v. Commonwealth, 165 Va. 821, 825-26, 183 S.E. 435, 437 (1936)).

Our decision in Henning is instructive in this case.  In Henning, a medical negligence action, the defense counsel sought to cross-examine the plaintiff's expert witness regarding how that witness became involved in the trial of that case.  The circuit court refused to permit defense counsel to cross-examine the expert witness on that subject other than allowing defense counsel to ask a narrow question whether the witness was being paid to give his testimony.  Defense counsel argued that the circuit court erred in prohibiting them from revealing to the jury that the plaintiff's expert witness was employed by a company engaged in the business of providing expert testimony in medical negligence cases.  Id. at 187, 366 S.E.2d at 112-13.  We reversed the judgment of the circuit court in favor of the plaintiff, and we stated:

14

"The defendant doctors were entitled to attempt to persuade the jury that [the plaintiff's expert witness] was a 'doctor for hire,' who was part of a nationwide group that offered themselves as witnesses, on behalf of medical malpractice plaintiffs. Once the jury was made aware of this information it was for the jury to decide what weight, if any, to give to [the expert witness'] testimony. This was a classic case of an effort to establish bias, prejudice, or relationship.

"The trial court went too far when it limited defendants' cross-examination to the bare question whether [the expert witness] was being paid to testify."

Id. at 188-89, 366 S.E.2d at 113.

We applied our holding in Henning when we decided Lombard v. Rohrbaugh, 262 Va. 484, 551 S.E.2d 349 (2001), and we held that the circuit court did not err in permitting a plaintiff to cross-examine the defendant's expert witness to show that the witness had received over $100,000 per year in payments for the years 1998 and 1999 from the defendant's insurance company. Id. at 495, 551 S.E.2d at 355. We held that

"testimony concerning liability insurance may be elicited for the purpose of showing bias or prejudice of a witness if there is a substantial connection between the witness and the liability carrier. If a substantial connection is demonstrated, its probative value concerning potential bias or prejudice outweighs any prejudice to the defendant resulting from the jury's knowledge that the defendant carries liability insurance."

Id. at 497, 551 S.E.2d at 356.

Similarly, we hold that in this case the plaintiff was entitled to cross-examine the defendant's expert witness, Dr. Lander, to show that he had previously testified as an expert

15

witness on behalf of Dr. Comerci and that he had been compensated. The amount of money that Dr. Comerci paid Dr. Lander in a prior case was a relevant area of inquiry because that testimony may have indicated to the jury that he was biased in her favor. The probative value concerning this potential bias outweighed any prejudice to Dr. Comerci resulting from the jury's knowledge that she had been a defendant in an unrelated lawsuit. Therefore, the circuit court abused its discretion in failing to permit the plaintiff to elicit this testimony.

VI.

We will reverse the judgment of the circuit court and remand this case for a new trial consistent with the views expressed in this opinion.

Reversed and remanded.