Desiree GARCIA, Plaintiff–Appellee,

v.

Moges MEKONNEN, Defendant–
Appellant.

No. 05CA1007.

Colorado Court of Appeals,
Div. I.

Feb. 8, 2006.

John R. Rodman & Associates, John R. Rodman, Caleb Meyer, Denver, Colorado; Barker & Tolini, P.C., Jeffrey J. Barker, Joshua N. Tolini, Colorado Springs, Colorado, for Plaintiff–Appellee.

Lapin & Viorst, P.C., Anthony Viorst, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge ROTHENBERG.

In this personal injury action, defendant, Moges Mekonnen, appeals the trial court's judgment entered on a jury verdict finding in favor of plaintiff, Desiree Garcia. We affirm.

This case arises out of an automobile accident between the parties on April 24, 2004, which caused both to suffer physical injuries. Garcia testified at trial that she was driving eastbound on Hampden Avenue in Denver approaching the intersection of Tamarac Drive, and that Mekonnen made a lefthand turn in front of her vehicle. Mekonnen testified that he was turning his vehicle from westbound Hampden onto southbound Tamarac during the yellow cycle of the traffic light. He claimed that Garcia was speeding, that she ran a red light, and that she collided with his vehicle.

At trial, both parties called reconstruction experts to testify regarding the cause of the accident. Mekonnen attempted to cross-examine Garcia's expert, a professional engineer and accident reconstructionist, to show he had a "substantial connection" with Garcia's insurer, State Farm Insurance and, therefore, the expert was biased.

However, the trial court excluded the testimony under CRE 403, finding that the "incremental probative value of bringing out the fact that [Garcia's expert] makes a substantial amount of money from State Farm" was outweighed by the danger of unfair prejudice and confusion of the issues.

The jury found Mekonnen sixty-seven percent negligent and Garcia thirty-three percent negligent. It awarded her $29,000 in damages reduced by her percentage of fault.

## I.

■ Mekonnen first contends the trial court abused its discretion by not permitting him to cross-examine Garcia's expert regarding the expert's "substantial connection" with Garcia's insurer, State Farm Insurance. Mekonnen maintains that the trial court engaged in an incorrect analysis by separately applying CRE 403 and weighing the probative value of the evidence against its potential for unfair prejudice and confusion of the issues. Relying on *Bonser v. Shainholtz,* 3 P.3d 422 (Colo.2000), he takes the position that if a substantial connection is shown between a witness and a party's insurer, the court should not separately consider CRE 403. We disagree.

■ The scope and limits of cross-examination of a witness for bias are within the sound discretion of the trial court, and its decision will not be disturbed unless it is manifestly arbitrary, unreasonable, or unfair. *Bonser, supra.*

CRE 411 prohibits the admission of evidence that a party is insured to show the party acted wrongfully. But evidence of insurance may be offered for another purpose, "such as proof of agency, ownership, or control, or bias or prejudice of a witness." CRE 411.

■ In *Bonser,* the Colorado Supreme Court upheld a trial court's ruling admitting evidence that a witness and the respondent belonged to the same insurance trust. As a matter of first impression, the supreme court adopted the "substantial connection test" used by a number of other jurisdictions. The substantial connection test permits a party to show a substantial connection between a witness and an insurance carrier as evidence of the potential bias of the witness. The test can be met by showing an expert witness's economic relationship with a specific insurer. *Bonser, supra.*

In *Bonser,* the supreme court concluded the witness had a substantial connection to the respondent's insurance trust because the witness had co-founded the trust and had a financial stake in it. The court also upheld the trial court's finding that the probative value of the evidence substantially outweighed any risk of prejudice to the respondent. But contrary to Mekonnen's conten-

tion, the supreme court in *Bonser* did not obviate the duty of the trial court to conduct a CRE 403 analysis.

The supreme court stated that after the trial court determines that a substantial connection exists, it must employ CRE 403 to weigh whether the probative value of the evidence substantially outweighs any risk of unfair prejudice or confusion of the issues. *Bonser, supra,* 3 P.3d at 426. The court added that evidence must be afforded the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected. *Bonser, supra,* 3 P.3d at 426–27; *see Mills v. Grotheer,* 957 P.2d 540, 543 (Okla.1998) (court adopted the substantial connection test and stated that "a trial court must determine when an expert's connection to a defendant's insurer is probative enough to substantially outweigh the prejudice to defendant resulting from the jury's knowledge that defendant carries liability insurance").

In *Strain v. Heinssen,* 434 N.W.2d 640, 643 (Iowa 1989), one of the cases cited with approval in *Bonser,* the plaintiff sought to present evidence during cross-examination that two defense experts were hired by the defendant's malpractice insurance carrier. There, as here, the plaintiff's purpose was to reveal the bias of the witnesses as "hired guns" for the insurance carrier. *Strain, supra,* 434 N.W.2d at 641.

The trial court disallowed the evidence, and its ruling was upheld by the Iowa Supreme Court, which reasoned:

> The record before us discloses no evidence that the relationship between [the expert witnesses] and [defendant's insurer] is closer than that of any other experts and the insurer calling them in a malpractice case. Beyond mere payment in exchange for testimony in this trial (and in [one expert's] case, a handful of other trials), no agency or employment relationship was established. . . .
>
> . . . [W]e think the trial court reasonably balanced the questions of relevancy, probative value and prejudice implicated when the revelation of insurance coverage is at issue. . . . Here the trial court allowed [plaintiff] wide latitude to question the de-

fense witnesses about whether they were paid to testify and the frequency with which they testify for doctors in malpractice cases. It was obvious on whose behalf they were testifying. On this issue of "disinterestedness," we think the relevant evidence is not who paid for their testimony but the fact it was procured through a promise of compensation by the defense. As for the potentially prejudicial impact of revealing insurance coverage, we think the trial court reasonably balanced the competing interests in accordance with Iowa Rule of Evidence 403. Where, as here, the plaintiff is the parent of a brain damaged child who faces a lifetime of expense for the child's care and treatment, the potential for jury sympathy would be understandably high. The corresponding danger that such sympathy would translate into a higher verdict if the fact of insurance coverage were revealed to the jurors, rather than just suspected by them, justified the cautious approach demonstrated by the trial court. In other words, the district court reasonably excluded the evidence of insurance because it had doubtful relevance and was [prejudicial].

*Strain, supra,* 434 N.W.2d at 643 (citations omitted); *see Davila v. Bodelson,* 103 N.M. 243, 250, 704 P.2d 1119, 1126 (Ct.App. 1985)("[T]he trial court has a great deal of discretion in deciding when to admit this type of evidence, which requires, even when it falls within one of the exceptions to Evid. Rule 411, a balancing of the probative value against the prejudicial effect and against other considerations listed in Evid. Rule 403.").

Courts employing the substantial connection test have permitted the cross-examination of an expert witness regarding the amount of money paid to that witness in a prior case, *see Sawyer v. Comerci,* 264 Va. 68, 563 S.E.2d 748 (2002), and the expert witness's employment relationship with the defendant's insurer. *See Yoho v. Thompson,* 345 S.C. 361, 366, 548 S.E.2d 584 (2001) (evidence of defense expert's medical consulting work for insurance carrier was admissible); *Lombard v. Rohrbaugh,* 262 Va. 484, 551 S.E.2d 349 (2001)(trial court did not err in permitting the cross-examination of the

defendant's expert witness to show the witness had received over $100,000 in compensation per year, for two years, from the defendant's insurer).

Nevertheless, although the *Bonser* court did not further define the substantial connection test, we are persuaded that something "[b]eyond mere payment in exchange for testimony [at] trial" must be established. *Strain, supra,* 434 N.W.2d at 643. As the court explained in *Mills v. Grotheer, supra,* 957 P.2d at 543:

> The requisite strength of connection would include ownership, agency, or employment. Ownership must be more than membership in a mutual insurance company, agency includes membership on an insurer's board of directors or claims review committee, and employment must be something beyond the expert's fee for services in the matter being adjudicated.

Here, Mekonnen attempted to cross-examine Garcia's expert regarding his financial connection to State Farm, particularly the fact that he had testified on behalf of State Farm in numerous previous cases and had received "close to [fifty] percent of his income from State Farm cases and ... over $100,000 ... from [it]."

We acknowledge that the expert regularly testified for State Farm, but unlike in *Bonser,* there was no evidence here that an adverse judgment would impact his personal finances. Further, there was no agency or employment relationship between him and State Farm. *See Strain, supra.* This case is also distinguishable from *Evans v. Colorado Permanente Medical Group, P.C.,* 902 P.2d 867 (Colo.App.1995), *aff'd in part and rev'd in part on other grounds,* 926 P.2d 1218 (Colo.1996), where a division of this court concluded an expert's position on the board of directors of the defendant's insurer made it more probable that he was biased.

Further, here, the trial court allowed Mekonnen to elicit testimony from the expert regarding the percentage of times he had testified for defendants, as opposed to plaintiffs. The expert admitted he testified "about three-fourths [of the time for the] defense, one-fourth [for the] plaintiff," and he received $350 per hour for testifying. The

trial court's ruling allowed Mekonnen to demonstrate the expert's bias without bringing in the fact that Garcia is insured.

We therefore conclude the trial court did not abuse its discretion by not permitting Mekonnen to cross-examine Garcia's expert regarding his "substantial connection" with Garcia's insurer, nor did the court engage in an incorrect legal analysis by separately applying CRE 403.

## II.

■ Mekonnen next contends the trial court abused its discretion in prohibiting him from cross-examining Garcia's expert with the *Colorado Driver Handbook* (the *Handbook* ). According to Mekonnen, the court did not allow him to lay a proper foundation to cross-examine Garcia's expert witness with the *Handbook.* Alternatively, Mekonnen contends the *Handbook* is a learned treatise and he was not required to lay a foundation showing that Garcia's expert relied on it. We reject both contentions.

### A.

In his written report, Garcia's expert stated:

> [I]t is probable that Mr. Mekonnen was attempting to "cheat the corner,". as the reported point of impact is consistent with [Mekonnen's vehicle] turning into the improper lane of Tamarac Drive. Additionally, had Mr. Mekonnen properly waited at the stop line or crosswalk, which according to the [*Handbook* ] is the proper action, until there was a sufficient gap in traffic, or had he waited for a green arrow traffic signal, the accident would have likely been avoided.

During his direct examination, Garcia's expert did not express an opinion whether Garcia's conduct was lawful or reasonable. He testified about the speeds of the vehicles involved, the timing sequence of the traffic lights at the intersection, the likely speed of Garcia's vehicle when she began to brake, the scientific basis underlying his opinion, and his assessment of the testimony of Mekonnen's expert.

During cross-examination, Mekonnen's counsel attempted to question the expert about his reliance on the *Handbook*, its statements regarding the proper driver conduct at a yellow light, and its applicability to the opinions in his report. Mekonnen's counsel asked the expert whether he was "aware the [*Handbook*] ... says that at a yellow light, you should stop unless you are already within the intersection."

Garcia objected and the trial court sustained the objection. However, the trial court ruled that Mekonnen's counsel could cross-examine the expert using the *Handbook* if counsel could lay a proper foundation by showing the expert had relied on it in formulating his opinions and conclusions. Mekonnen's counsel then asked the expert: "[I]n determining whether [Garcia's] conduct was proper, did you use the [*Handbook*]?" The expert said, "No," and said he relied on the laws of physics. Mekonnen's counsel did not ask any further questions regarding the *Handbook*.

We therefore conclude the trial court gave Mekonnen an opportunity to lay a proper foundation regarding the *Handbook*, and we reject his contention that the court failed to do so.

### B.

We also reject Mekonnen's alternative contention that the *Handbook* is a learned treatise and therefore needed no foundation.

■ An expert may be cross-examined using a learned treatise even though the expert may not have relied upon it in reaching his or her conclusions. *People v. Beasley*, 43 Colo. App. 488, 608 P.2d 835 (1979). But the proponent of the evidence must show the purported learned treatise is a reliable authority. *Beasley, supra.*

■ CRE 803(18) allows an expert to be cross-examined by means of a learned treatise if the testimony involves "statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine or other science or art." A learned treatise is admissible as a hearsay exception and may be used to impeach the reliability of the live testimony of an expert witness with scientific or other expertise. David H. Kaye, David E. Berstein & Jennifer L. Mnookin, *The New Wigmore: Expert Evidence* § 4.1 (2004).

Mekonnen relies on the facts that (1) Garcia's expert referred to the *Handbook* in his written report, acknowledged during his trial testimony that it is a reliable authority, and described the *Handbook* as "an indication of proper driving behaviors and actions"; (2) the *Handbook* is published by the Colorado Division of Motor Vehicles; and (3) it was endorsed by Governor Bill Owens as "part of the State's continuing commitment to safety on the roads and responsible driver's education."

However, Mekonnen has cited no authority holding that a state driver's handbook is a learned treatise, and we have found very little guidance on this issue. *See Lievrouw v. Roth*, 157 Wis.2d 332, 459 N.W.2d 850, 858 n. 9 (Wis.Ct.App.1990)(observing, in dictum, that a Wisconsin Motorist Handbook would be admissible under the hearsay exception for learned treatises); *cf. Paulos v. Covenant Transport, Inc.*, 86 P.3d 752 (Utah Ct. App.2004) (concluding an American Trucking Association handbook was admissible under the learned treatise exception).

■ The *Handbook* describes itself as "a summary of the laws, rules and safe driving practices that apply to all persons who drive a vehicle in the state of Colorado ... based on current laws, legislation and department policies." However, the *Handbook* clarifies that "[i]t is based on current laws, legislation and department policies and is subject to change," and expressly states, "It is *not* a book of laws and should *not* be used as a basis for any legal claims or actions. *It is a book of information only and does not supersede Colorado Revised Statutes.*" (Emphasis added.)

We therefore conclude the *Handbook* is not a learned treatise within the meaning of CRE 803(18).

■ In any event, we further conclude the trial court's ruling limiting the use of the *Handbook* during the cross-examination of Garcia's expert was harmless because the

court properly instructed the jury regarding the traffic laws applicable in this case.

### III.

■ Mekonnen next contends the trial court erred in permitting Garcia to testify regarding her inability to pay her medical bills. He maintains that evidence of her inability to pay her medical bills was irrelevant and that it affected the jury's damage award. We agree this testimony should not have been admitted, but perceive no reversible error.

■ Statements concerning the financial status of a party or creating an inference of the absence of insurance are improper because they have little or no probative value, are inflammatory, and may appeal to the sympathy of the jury. *Nat'l Sur. Co. v. Morlan*, 91 Colo. 164, 13 P.2d 260 (1932); *Cook Inv. Co. v. Seven–Eleven Coffee Shop, Inc.*, 841 P.2d 333 (Colo.App.1992); *Appel v. Sentry Life Ins. Co.*, 701 P.2d 634, 638 (Colo. App.1985), *aff'd*, 739 P.2d 1380 (Colo.1987).

■ Similarly, evidence of a plaintiff's poverty and financial distress caused by medical bills is inadmissible in a personal injury action. *Meagher v. Garvin*, 80 Nev. 211, 391 P.2d 507 (1964); *see Singles v. Union Pac. R.R.*, 174 Neb. 816, 824, 119 N.W.2d 680, 684–85 (1963)(concluding there was prejudicial error where plaintiff's testimony regarding inadequacy of pension constituted "immaterial evidence which would only result in inciting the sympathy of the jury"); *Waldroop v. Driver–Miller Plumbing & Heating Corp.*, 61 N.M. 412, 418, 301 P.2d 521, 525 (1956)(concluding the admission of evidence of claimant's poverty in workers' compensation proceeding constituted reversible error); *Million v. Rahhal*, 417 P.2d 298 (Okla.1966) (admission of evidence that a party did not have liability insurance constituted reversible error).

Garcia's reliance on *Goodson v. American Standard Insurance Co.*, 89 P.3d 409 (Colo. 2004), is misplaced. That case concerned emotional distress damages arising from an insurance bad faith claim where evidence of insurance was already before the jury. Ac-

cordingly, the facts of that case are distinguishable from this case.

Here, the trial court allowed Garcia to testify, over Mekonnen's objection, she had "quite a few" medical bills related to the accident that she could not pay and her inability to pay those bills had caused her mental anguish. She stated:

> I'm a single mom, and I barely make ends meet on what I get paid now. And I have bill collectors calling my job.... And I have a car; my job; my house; it's just very stressful, and it's killing my credit. I was hoping to establish credit as a single mom, and you know, I want one day to be able to get a mortgage on a house, and I don't know if I'm going to be able to do that with this credit—with all these bills on my credit, now, and I don't know how I'm going to be able to pay them.

During its deliberations, the jury sent the court a note asking whether it should consider "prior costs such as medical expenses, vehicle repair or replacement, and other expenses incurred [by Garcia] prior to [trial]." The court responded: "You may not consider prior costs for medical expenses, vehicle repairs or replacement because there's no evidence as to what those costs were. Except, you may consider the fact that a party may have incurred those costs when you're considering some of the elements of non-economic damages."

We conclude the trial court erred in permitting Garcia to testify regarding her inability to pay her medical bills and in its response to the jury.

Nevertheless, we conclude the error was harmless in this case. The jury awarded Garcia damages for noneconomic losses of $16,000, and economic losses of $8,000. The jury similarly awarded Mekonnen $16,000 for his noneconomic damages and $5,000 for his economic losses. Garcia's medical bills totaled roughly $10,000. The fact that the jury awarded Garcia and Mekonnen the same amount for their noneconomic damages strongly suggests that Garcia's testimony did not improperly impact the jury's damage award.

In addition, the court instructed the jury that it was not to "be influenced by sympathy or by prejudice for or against any party in this case," and absent evidence to the contrary, we presume the jury followed the instructions. *See People v. Harlan*, 8 P.3d 448 (Colo.2000); *People v. Ellsworth*, 15 P.3d 1111 (Colo.App.2000); *People v. Hansen*, 920 P.2d 831 (Colo.App.1995). Accordingly, we conclude admission of this testimony was harmless error.

Judgment affirmed.

Judge MÁRQUEZ and Judge BERNARD concur.