COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Decker, Judges Beales and Raphael
Argued at Norfolk, Virginia


TINA C. RODRIGUE, M.D., ET AL.

                                                          OPINION
v.        Record No. 1521-22-1                  JUDGE STUART A. RAPHAEL
                                                     JANUARY 30, 2024

LORETTA BUTTS-FRANKLIN


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

Ronald P. Herbert (Harman, Claytor, Corrigan & Wellman, PC, on
briefs), for appellants.

Paul L. Warren (Warren PLC, on brief), for appellee.


Following a four-day trial in this medical-malpractice case, the jury awarded Loretta

Butts-Franklin $1,183,000 in damages against Tina C. Rodrigue, M.D., Chelsea Baker Smith, and

Hampton Roads Neurosurgical Associates, P.C. (collectively, "defendants").  Defendants seek a

new trial on the ground that the trial judge refused to instruct the jury on Butts-Franklin's duty to

mitigate her damages.  Because defendants failed to show *when* Butts-Franklin's alleged failure to

mitigate occurred, let alone that it happened *after* defendants committed the medical malpractice

alleged, we find no error and affirm the judgment.

                                    BACKGROUND

When reviewing a trial court's refusal to grant a jury instruction, we view the evidence in

the light most favorable to the proponent of the instruction—here, the defendant medical

professionals.  *See Watson v. Commonwealth*, 298 Va. 197, 207 (2019); *Holmes v. Commonwealth*,

76 Va. App. 34, 52-53 (2022).

On January 7, 2016, Dr. Rodrigue performed surgery on Butts-Franklin's right wrist as a treatment for carpal tunnel syndrome. The surgery involved making an incision to the wrist, performing the procedure, and then closing the incision with four sutures. There were no complications during the surgery, and Butts-Franklin was discharged from the hospital the same day.

Before discharging Butts-Franklin, Dr. Rodrigue instructed her to return to the hospital in ten days to get her sutures removed. Dr. Rodrigue further instructed her to refrain from soaking her hand in water to reduce the risk of infection. A nurse provided Butts-Franklin with written discharge instructions that said, "Keep hand clean and dry until sutures removed; no soaking hand in water."

Butts-Franklin testified that within three or four days of the surgery, her wrist was "warm" to the touch and red around the incision area. She said she called Dr. Rodrigue's office and spoke to Chelsea Smith, Dr. Rodrigue's medical assistant, but because Butts-Franklin had an upcoming appointment, nothing happened. Smith testified that Butts-Franklin called multiple times, "every couple of days" between the surgery and the suture removal, asking for more or different pain medications, which Dr. Rodrigue refused to prescribe. Smith said that, although she did not record a note for each call, she reported each one to Dr. Rodrigue.[1] Smith testified that Butts-Franklin never reported during those calls that the wound was "red, hot, foul smelling [or] swollen," or

---

[1] One of Smith's notes reflects that Butts-Franklin called on January 7 (the same day as the surgery), requesting that she be prescribed a different pain medication; Butts-Franklin denied making that call. According to the note, after being denied the prescription, Butts-Franklin told Smith "that she would just take her complaint elsewhere and go to the ER to get something else." An exhibit introduced by Butts-Franklin at trial included a medical record appearing to show that Butts-Franklin went to Sentara Leigh Hospital on January 8, where she received an injection of ketorolac for pain relief.

anything else that would suggest infection.  No follow-up visit was scheduled before the suture-removal visit.

About seven to ten days after the surgery, Butts-Franklin went to Dr. Rodrigue's office to have the sutures removed.[2]  Smith removed the sutures, noting that the wound was not infected or swollen.  Smith saw "[n]othing out of the ordinary."  Smith removed all the sutures, though Butts-Franklin claimed there was still one suture left.  Smith then got a physician's assistant, Jamie Rogalla, to look at Butts-Franklin's wrist.  Rogalla did not find any remaining sutures,[3] nor did she see any infection or redness.  Butts-Franklin denied that anyone other than Smith saw her that day.  Butts-Franklin left the office without a follow-up appointment scheduled.

Butts-Franklin testified that she called the next day and asked to see Dr. Rodrigue, but Smith told Butts-Franklin she did not need to see the doctor because her wrist was "fine."  In the following days, Butts-Franklin said that she continued to experience pain, increased swelling, and redness.  She also noticed that her wrist "started to ooze at the incision and it didn't smell right."  Butts-Franklin said that she called Dr. Rodrigue's office a couple more times over the following days, but again no follow-up visit was scheduled by Dr. Rodrigue.  For her part, Smith testified that Butts-Franklin never mentioned any redness or pain symptoms during any call with Smith after the sutures were removed.  Had Butts-Franklin mentioned those symptoms, Smith said she "would have immediately brought her in and told Dr. Rodrigue."

---

[2] Defendants did not make a record of the visit on the date it occurred, and no witness claimed to remember the exact date.  Smith testified that Butts-Franklin came in "seven to ten days after her surgery," so the visit "would have been either the 15th [a Friday] or the 18th [a Monday]."

[3] When performing surgery on Butts-Franklin's wrist the following week, Dr. Rodrigue likewise found no leftover sutures.

On January 22, Butts-Franklin went to the Chesapeake Regional Medical Center emergency room seeking treatment for pain in her wrist. The doctors there diagnosed Butts-Franklin with an infection, prescribed antibiotics, and told her to follow up with Dr. Rodrigue. Butts-Franklin was discharged from Chesapeake Regional Medical Center the next morning.

On January 25, Butts-Franklin called Dr. Rodrigue's office to inform her of the emergency-room visit, spoke to Smith, and scheduled a follow-up appointment for the next day. Upon examining Butts-Franklin's wrist, Dr. Rodrigue recommended immediate surgery to treat the infection. In a note dated January 26, Dr. Rodrigue wrote that Butts-Franklin "has had excessive pain complaints since the time of surgery," and "[l]ast week, she had her sutures removed which was unremarkable and no problems were noted at the time of the suture removal." Dr. Rodrigue added that Butts-Franklin "remarked that she had been soaking her hand at home." Dr. Rodrigue testified that she wrote that note because Butts-Franklin told Dr. Rodrigue she had been soaking her hand to relieve her pain. Butts-Franklin denied soaking her hand in water during the 14 days after the surgery.

Butts-Franklin underwent surgery that night and stayed in the hospital for 11 days, during which she underwent 2 additional surgeries to clear the infection. Butts-Franklin ultimately recovered, but she lost significant use of her right hand. Her medical bills for the post-operative care totaled approximately $183,000. Butts-Franklin brought this medical malpractice action against defendants seeking to recover damages for her medical bills, pain and suffering, and loss of mobility in her wrist. The jury trial lasted four days.

Butts-Franklin argued at trial that the delay in diagnosing the infection between January 7 and January 26 resulted in the infection's progressing to the point where she needed 3 additional surgeries and an 11-day hospital stay. Two expert witnesses for defendants testified, relying on Dr. Rodrigue's January 26 note, that Butts-Franklin's soaking her hand sometime between January

7 and January 26 caused or increased the severity of her infection. Neither pinpointed during that period, however, when the alleged soaking occurred. Dr. John Reavey-Cantwell, a neurosurgeon, explained that healthcare providers commonly instruct patients not to get surgical wounds wet because doing so increases the likelihood of infection. He concluded that Butts-Franklin increased the risk of her suffering the infection by soaking her hand in disregard of her post-operative instructions. Dr. John Sampson, also a neurosurgeon, testified that assuming Dr. Rodrigue's January 26 note was correct and that Butts-Franklin had been "soaking her hand before that second surgery . . ., then that dramatically increased the risk of infection and also probably dramatically increased [the] . . . severity of the infection."[4]

At the close of evidence, defendants requested the following jury instruction relating to Butts-Franklin's duty to mitigate her damages: "Plaintiff has a duty to minimize her damages. If you find that the Plaintiff did not act reasonably to minimize her damages and that, as a result, they increased, then she cannot recover the amount by which they increased." Defendants argued that the evidence relating to Butts-Franklin's soaking her hand supported the theory that Butts-Franklin failed to mitigate her damages, meriting the proposed instruction.

The trial judge denied the instruction. The court explained, "I think the theory of [defendants'] case is that [Butts-Franklin] contributed to her own injury by her alleged submersion of her wound, and I think it more relates to causation and proximate cause than it does to damages." The trial judge further noted, "The theory that you're arguing, I think, is more of a causation issue."

---

[4] Butts-Franklin introduced the deposition testimony of Dr. Paul Kaloostian, a neurosurgeon, who said that he could not "rule out" that the infection resulted from soaking the hand. He said, "I don't know if soaking the hand in the water, if that happened, caused the infection," noting that Butts-Franklin was diabetic and that "other hygiene things" may have contributed to the infection, given that it was her right (dominant) hand. Dr. Kaloostian, when shown a January 22 picture of Butts-Franklin's wrist infection, opined that the infection was about four or five days old.

The jury returned a verdict for Butts-Franklin and awarded her damages in the amount of $1,183,000, with prejudgment interest from February 1, 2016. Defendants moved to set aside the verdict, arguing that the trial court committed reversible error by refusing their mitigation instruction. At the posttrial hearing, defendants argued that they were entitled to a mitigation instruction because there was some evidence of plaintiff's failure to mitigate; they claimed that the trial court acknowledged as much by saying it was more of a proximate cause issue than a damages issue. Butts-Franklin responded that "[t]here is nothing temporally whatsoever as to when any alleged mitigation could have/should have occurred" and that the trial court correctly refused the instruction.

The trial court denied defendants' motion and entered final judgment for Butts-Franklin on the jury verdict. Defendants noted a timely appeal.

ANALYSIS

Defendants argue that the trial court erred by refusing their proposed mitigation instruction because there was more than a scintilla of evidence that Butts-Franklin failed to mitigate her damages when she soaked her hand sometime after the January 7 surgery. "A trial court's decision whether to grant or refuse a proposed jury instruction is generally subject to appellate review for abuse of discretion." *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017); *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022). But "[a] litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory." *Hancock-Underwood v. Knight*, 277 Va. 127, 130 (2009) (alteration in original).

The evidence is sufficient to support a theory of the case if it "amount[s] to more than a scintilla." *Id.* at 131 (quoting *Holmes v. Levine*, 273 Va. 150, 159 (2007)). "We have declined to define the term 'scintilla,' but instead [have] held that it should be "'resolved on a case-by-case basis" by assessing the evidence in support of a proposition against the "other credible evidence that

negates" it.'" *Edwards v. Commonwealth*, 65 Va. App. 655, 662-63 (2015) (quoting *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999)).

"One who is injured by the wrongful or negligent acts of another, whether as the result of a tort or of a breach of contract,[5] is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage . . . ." *Monahan v. Obici Med. Mgmt. Servs., Inc.*, 271 Va. 621, 636 (2006) (quoting *Lawrence v. Wirth*, 226 Va. 408, 412 (1983)). Thus, "to the extent that [the plaintiff's] damages are the result of his active and unreasonable enhancement thereof or are due to his failure to exercise such care and diligence, he cannot recover." *Id.* (quoting *Lawrence*, 226 Va. at 412). "[T]he party asserting [a failure-to-mitigate] defense . . . b[ears] the burden of proof on that issue." *Forbes v. Rapp*, 269 Va. 374, 380 (2005). "Generally, whether a plaintiff acted reasonably to minimize his damage is a question for the jury." *Evans v. Evans*, 280 Va. 76, 85 (2010) (quoting *Sawyer v. Comerci*, 264 Va. 68, 77 (2002)).

Although a plaintiff's obligation to use reasonable care to mitigate damages is sometimes called a "duty" to mitigate damages, *Monahan*, 271 Va. at 636, phrasing that obligation as a *duty* can be "misleading." Kent Sinclair, *Sinclair on Remedies* § 3-6[A], at 3-58 (5th ed. 2016). "[A] failure to mitigate does not expose a party to any liability. What the failure to mitigate does do is result in a limitation on the amount of damages the party who failed to mitigate can recover." *Id.* at 3-58 to 3-59.

The duty to mitigate damages serves an important function. "[W]ithout a mitigation rule, plaintiffs would have a perverse incentive to sit back and let their damages mount, even though they could stanch the loss by exercising reasonable care." *Id.* at 3-59. "Mitigation doctrine—by forcing

---

[5] The formulation of the mitigation-of-damages defense is generally the same for claims sounding in tort and in contract. *Compare* Model Jury Instrs.—Civ. No. 35.110 ("Patient's Duty to Mitigate Damages"), *with* Model Jury Instrs.—Civ. No. 45.550 ("Damages: Duty to Mitigate").

plaintiffs to act as if their losses were not insured—encourages plaintiffs to reduce the societal costs of their injuries." *Id.* "It is only incumbent upon [the plaintiff], however, to use reasonable exertion and reasonable expense . . . ." *Haywood v. Massie*, 188 Va. 176, 183 (1948).

Critical to resolving this case is the *temporal* element that distinguishes the plaintiff's duty to mitigate damages from the doctrine of contributory negligence. Those two defenses are based on "separate and distinct tort principles." *Diehl v. Butts*, 255 Va. 482, 491 (1998). "The basis for the distinction results from the differing *times* when the plaintiff's duty to avoid unnecessary harm arises under each doctrine." Sinclair, *supra*, § 3-6[A], at 3-62 (emphasis added).

If the plaintiff's injury occurs because the plaintiff failed to exercise reasonable care *contemporaneously* or *concurrently* with the negligent act of the defendant, it constitutes contributory negligence that bars the plaintiff's recovery. *See Chandler v. Graffeo*, 268 Va. 673, 681 (2004) ("To constitute contributory negligence in a medical-malpractice case, a plaintiff's negligence must be contemporaneous with the claimed defendant's negligence."); *Sawyer*, 264 Va. at 75 ("[I]n order for contributory negligence to bar a plaintiff's recovery in a medical negligence action, the plaintiff's negligence must be concurrent with the defendant's negligence."). "[I]n the medical malpractice context, this requirement means that the patient's negligent act must be contemporaneous with the main fact asserted as the negligent act of the physician." *Sawyer*, 264 Va. at 75 (quoting *Ponirakis v. Choi*, 262 Va. 119, 125 (2001)).

By contrast, and "[u]nlike contributory negligence, the plaintiff's duty to mitigate damages arises *only after* the defendant's tortious conduct." Sinclair, *supra*, § 3-6[A], at 3-62 (emphasis added). Our Supreme Court has described the patient's duty to mitigate damages as arising "*after* receiving negligent medical care," or "'*following* his physician's negligent treatment.'" *Monahan*, 271 Va. at 636 (emphases added) (quoting *Sawyer*, 264 Va. at 77). *See also* Model Jury Instrs.—Civ. No. 35.110, at 35-42 (2022-2023) (advising that the mitigation instruction "is applicable where

- 8 -

there is evidence that a patient, *after* an act of malpractice, failed to exercise ordinary care for his own health and thus increased his damages" (emphasis added)).[6]

Another difference is in the rules for *pleading* the affirmative defenses of contributory negligence and failure to mitigate damages. "Contributory negligence will not constitute a defense unless pleaded or shown by the plaintiff's evidence." Rule 3:18(c). By contrast, even though the plaintiff's failure to mitigate damages is "an affirmative defense," *Forbes*, 269 Va. at 380, the defendant need not plead that defense in the answer, *Monahan*, 271 Va. at 631-32.

A jury instruction—whether on contributory negligence or duty to mitigate—"may be given only if there is evidence to support the instruction." *Monahan*, 271 Va. at 636 (quoting *Pollins v. Jones*, 263 Va. 25, 28 (2002)). The proponent of the instruction must show that "more than a scintilla" of evidence supports it. *Id.* (quoting *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004)); *Sawyer*, 264 Va. at 75 ("Hence, a defendant who asserts a defense of contributory negligence is not entitled to a jury instruction on contributory negligence if that defendant only adduces a mere scintilla of evidence of the plaintiff's purported contributory negligence.").

The more-than-a-scintilla requirement has teeth. Numerous Virginia decisions have held that it was error for the trial court to grant a contributory-negligence or duty-to-mitigate instruction when the evidence was lacking. *See, e.g.*, *Monahan*, 271 Va. at 636-37 (holding that a mitigation instruction was not appropriate where the patient's decision to go home, rather than to the emergency room, was consistent with the doctor's advice); *Chandler*, 268 Va. at 681 (holding that

---

[6] Some courts in other jurisdictions have held that a defendant asserting a failure-to-mitigate defense must show "both how [the plaintiff] could have taken action to mitigate his damages and the amount of damages that might have been avoided by his proper mitigation." *Henry v. Mitchell*, 428 S.W.3d 454, 462 (Ark. 2013); *Eskenazi v. Mackoul*, 905 N.Y.S.2d 169, 171 (N.Y. App. Div. 2010) (same); *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 226 (Tex. Ct. App. 1999) ("[T]here must be some evidence in the record from which the jury can make a reasoned calculation about losses from failure to mitigate."). Our disposition of this appeal does not require that we decide if Virginia law imposes that additional requirement.

the trial court erred in granting a contributory-negligence instruction when the physician negligently discharged the patient by failing to recognize that his condition was "life threatening" and the patient, "a layman, c[ould not] be expected to know otherwise"); *Sawyer*, 264 Va. at 76 (finding evidence insufficient to support the contributory-negligence instruction, explaining that when the patient declined to be admitted to the hospital, the physician failed to explain that if the patient "chose to leave the hospital without being admitted . . . he could die").

Defendants here have intermixed the concepts of contributory negligence and failure to mitigate. Defendants argue that the post-operative infection that Butts-Franklin suffered occurred *because* Butts-Franklin soaked her hand in violation of her post-operative instructions. Dr. Reavey-Cantwell, for instance, testified that Butts-Franklin's alleged hand-soaking "certainly increase[d] the risk of infection." In their motion to set aside the verdict, defendants posited that "the majority of the damages plaintiff claimed - both the $183,000 in medical bills and the pain and suffering from the subsequent surgeries - resulted arguably after the plaintiff soaked her hand against medical advice." At oral argument here, defendants asserted that the jury might have awarded "zero" damages had a mitigation instruction been given.

But that argument sounds in contributory negligence, not mitigation of damages. To defendants, Butts-Franklin's alleged hand-soaking in violation of her post-operative instructions was a proximate cause of the infection, preventing her from recovering against them even if they had committed malpractice by failing to see her more quickly and to recognize the brewing infection. Yet defendants chose not to plead contributory negligence. Their answers merely "reserve[d]" the right to plead it, "should the facts so dictate." They did not ask to amend their answers to plead contributory negligence. Nor did they request that the jury be instructed on contributory negligence. It would have been improper for the trial court to permit defendants to

argue that Butts-Franklin's claims were barred by contributory negligence after defendants themselves gave up that defense.

Having intentionally abandoned a contributory-negligence defense, defendants cannot recover it through the backdoor of a mitigation instruction. True, a mitigation-of-damages defense need not be pleaded in the answer. But the facts here, even in the light most favorable to defendants, did not show that Butts-Franklin failed to mitigate damages that were caused in the first instance by defendants' malpractice.

Defendants concede there is no evidence in the record to show *when* Butts-Franklin soaked her hand during the period in question. Defendants thus fail to explain how Butts-Franklin's supposed hand-soaking aggravated or exacerbated damages caused by their own negligence. Defendants do not claim, for instance, that their delay in recognizing and treating the infection may have caused some injury, but the injury was made worse because Butts-Franklin soaked her hand. Defendants' theory of the case simply does not map onto a failure-to-mitigate scenario.

Defendants also overlook the critical importance of *when* the alleged soaking occurred in relation to the suture removal. Dr. Rodrigue performed the initial surgery on January 7, and the post-operative instructions warned Butts-Franklin, "Keep hand clean and dry *until sutures removed*." (Emphasis added).[7] The sutures were removed seven to ten days later. The infection came to light on January 22, when Butts-Franklin sought treatment for pain at Chesapeake Regional Medical Center. And Dr. Rodrigue did not record Butts-Franklin's statement that "she had been soaking her hand at home" until January 26, when Butts-Franklin presented with the infection.

---

[7] Butts-Franklin conceded that Dr. Rodrigue did not make a mistake in the original surgery on January 7 and that the treatment Butts-Franklin received to treat the infection on January 26 was "within the standard of care."

Defendants acknowledged at oral argument that the record does not tell us whether the alleged hand-soaking occurred before or after the sutures were removed. But if Butts-Franklin had soaked her hand *after* the sutures were removed, it "c[ould not] be the basis for a mitigation of damages instruction" because she "did not act contrary to the advice given." *Monahan*, 271 Va. at 637.

Without knowing when the soaking occurred, it would be "speculative and conjectural," *Sawyer*, 264 Va. at 76, whether such soaking was the *initial cause* of the infection, which could have supported a contributory-negligence defense had one been pleaded; whether the soaking occurred *after* defendants' malpractice, an essential element of the failure-to-mitigate defense; or whether it occurred after the sutures were removed, thereby barring a failure-to-mitigate defense under *Monahan.* In short, defendants' concession that the record does not permit the Court to determine *when* Butts-Franklin soaked her hand is fatal to their appeal.

CONCLUSION

We conclude that there was not "sufficient evidence in this record t[o] . . . permit the jury to find as a matter of fact that [Butts-Franklin] failed to mitigate h[er] damages." *Sawyer*, 264 Va. at 77. Thus, the trial court did not abuse its discretion by refusing to grant defendants' duty-to-mitigate instruction.

*Affirmed.*