COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, Ortiz and Friedman
Argued at Fredericksburg, Virginia


RESTON ANESTHESIA ASSOCIATES, P.C., ET AL.

                                                     OPINION BY
v.        Record No. 1792-23-4            JUDGE FRANK K. FRIEDMAN
                                                    OCTOBER 7, 2025
ELIZABETH S. BANDY


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Christie A. Leary, Judge

Paul T. Walkinshaw (Kathleen S. Ryland; Byron J. Mitchell;
Kristina L. Fattoum; Wharton Levin; Mitchell & Simopoulous,
PLLC, on briefs), for appellants.

Lauren M. Byrne (Robert E. Byrne, Jr.; John Simpson; MartinWren
PC, on brief), for appellee.


After a six-day medical malpractice trial, a jury awarded Elizabeth Bandy $2,500,000 in damages against Reston Anesthesia Associates, P.C. and Mirza Baig, M.D.[1] On appeal, Dr. Baig assigns error to four rulings made by the trial court, which he contends require reversal and a new trial. First, he argues that the trial court erred in refusing to give a superseding cause jury instruction. Second, he asserts that the trial court erred when it prohibited him from cross-examining an adverse witness for bias. Third, he contends that the trial court erred when it admitted two exhibits without establishing their authenticity as business records. Finally, he argues that the trial court erred in barring his expert witness from reading reliable medical literature into evidence. For the following reasons, we reverse and remand the case for further proceedings consistent with this opinion.

---

[1] The verdict was reduced to $2,250,000 under Code § 8.01-35.1. We will refer to Dr. Baig and the medical practice collectively as "Dr. Baig."

BACKGROUND

The central issue in this appeal involves the denial of a jury instruction on superseding cause. "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 118 (2021) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)). Viewed in the light most favorable to Dr. Baig, as the proponent of the refused instruction, the facts of this case are as follows.

*The Delivery Underlying the Lawsuit*

Elizabeth Bandy was admitted to Reston Hospital Center on August 13, 2021, for an induced delivery of her first child. Her regular physician recommended they induce her labor because she was past her due date. On Sunday, August 15, 2021, as Ms. Bandy's labor progressed, Dr. Mirza Baig, the only anesthesiologist on duty in the hospital, placed an epidural catheter[2] for pain management around 12:11 p.m., 13 minutes after he was requested to do so. Later, a nurse called Dr. Baig at 2:29 p.m. for pain management; he medicated Ms. Bandy at 2:37 p.m. Dr. Baig was called again at 4:58 p.m., came to the bedside and re-dosed Ms. Bandy at 5:09 p.m. He was paged again at 6:00 p.m. and directed the nurse to give Ms. Bandy a "top-off" of 8.5 ml of medication, "a clinician dose," because he was caring for another patient and could not come directly to the labor and delivery suite.

---

[2] An epidural catheter goes into the space between the covering of the actual spinal cord and where the nerves exit the cord, allowing the nerves "to be bathed in a very dilute local anesthetic[.]"

Dr. Wesley Hodgson, the obstetrical hospitalist,[3] increased Ms. Bandy's Pitocin[4] infusion at 5:53 p.m. He was at the bedside at 6:31 p.m. and Ms. Bandy began pushing at 6:34 p.m. The fetal heart rate decreased shortly thereafter, so Dr. Hodgson decided to attempt a vacuum-assisted delivery.[5] Dr. Baig was called at 6:43 p.m. and was informed that Dr. Hodgson had initiated a vacuum-assisted delivery. During this period of vacuum-assisted delivery attempts, Dr. Hodgson noted more decelerations in the fetal heart rate. He testified that a fetal heart rate below 110 is concerning for hypoxia. After the fourth unsuccessful vacuum-delivery attempt at 6:45 p.m., Dr. Hodgson called for an emergency caesarian delivery; Dr. Baig was notified of the emergency caesarian decision at 6:47 p.m.

Ms. Bandy was moved to the operating room at 6:49 p.m. The fetal heart rate had improved and was in the 90s at 6:51 p.m. At 6:52 p.m., Dr. Baig was informed he was needed immediately in Ms. Bandy's operating room; he responded that he was in the main operating room and would arrive in two to three minutes. His impending arrival was made known. Dr. Baig subsequently informed the nurse he was in the elevator, and he arrived in the room at 6:55 p.m.

According to Dr. Hodgson, he initiated the first C-section incision at 6:55 p.m. He was concerned that the fetal heart rate had dropped—and he asserted that, by 6:55 p.m., the fetus had experienced 17 minutes of fetal distress. This period of distress, Dr. Hodgson testified, could lead to fetal disability or death. And although Dr. Baig was only a minute away, Dr. Hodgson

---

[3] This means that Dr. Hodgson works "exclusively in the hospital and do[es] 24 hour shifts." Additionally, he covered for patients who did not have a doctor and responded to emergencies occurring at the hospital.

[4] This is a medication given to help induce labor or strengthen contractions.

[5] A vacuum-assisted delivery uses a small cup placed on the baby's head to apply suction to help move the head through the birth canal.

- 3 -

was concerned the lead time to set up for and administer anesthesia would be too long. Dr. Hodgson therefore decided to begin the caesarean operation without the benefit of Dr. Baig's anesthesia services.

Thus, seconds before Dr. Baig arrived, Dr. Hodgson made the abdominal incision at 6:55 p.m., employing a "procedure [he] learned in the Navy called caesarian section under local anesthesia" using lidocaine[6] "to prepare to be able to do the surgery if we did not have anesthesia." He stated that there was "quite a process that has to be done to get the patient asleep" and said that "we start[ed] looking at several more minutes before . . . I'm allowed to proceed with surgery." This assumption was hotly disputed by Dr. Baig's experts. The defense experts also asserted that various reasonable alternatives were available to address the fetal heartrate short of initiating a C-section without anesthesia—this included reducing the Pitocin dosage. Moreover, defense experts opined that an emergency did not exist—particularly given the fetus' improving heartrate after the cessation of the vacuum delivery attempts.[7]

Once Dr. Hodgson got Ms. Bandy's permission to proceed with the lidocaine delivery, he determined that "we didn't have [the lidocaine on hand] that [he] had been trained in," or "at least we didn't have that in the operating room to be provided to me. We didn't have syringes I needed." Dr. Hodgson stated, "unfortunately, the staff were not able to give me more lidocaine

---

[6] Lidocaine is an anesthetic used directly on the skin and injected into the local tissues.

[7] Dr. Bissell, a defense expert, opined that there was no reason to begin a C-section under local anesthesia and "compromise potential maternal safety" when the anesthesiologist was a minute away. Dr. Bissell reviewed the fetal heart rate monitoring and determined that the variability Ms. Bandy's baby experienced was "very common." Dr. Bissell also articulated options which are immediately available to the obstetrician to address bradycardia, such as repositioning the patient, giving the patient an intravenous fluid bolus, and stopping the medications to increase contractions, such as Pitocin. She concluded that an emergency was not imminent based on the recovering fetal heart rate in the operating room. Her opinion was bolstered by the baby's ability to "effectively resuscitate[] itself in utero." The child's umbilical cord pH also showed that she was "effectively well oxygenated and there [was] no concern for [her] wellbeing."

- 4 -

that I was asking for." He injected Ms. Bandy using 10 cc syringes rather than the necessary "50 cc syringe[s]." He then made the initial incision at 6:55 p.m. Dr. Hodgson said that Dr. Baig arrived "about when I was going through the peritoneal," which he described as a stretchy layer of tissue between the muscles before he incised the uterus.[8]

Although Ms. Bandy was receiving medication through the epidural catheter at the time of the initial incision, the medication was not dosed for delivery. Dr. Baig arrived when Dr. Hodgson was "looking at the uterus," and Dr. Hodgson instructed Dr. Baig to put Ms. Bandy to sleep. Dr. Baig promptly attached required monitoring devices to the patient and administered sevoflurane and propofol to place Ms. Bandy under general anesthesia. However, Dr. Hodgson did not wait the estimated "30 seconds" typically observed to allow the anesthesia to take effect before making the final incision into the uterus and delivering the baby. Dr. Hodgson entered the uterus at 6:56 p.m., and delivered the baby at 6:58 p.m. Dr. Hodgson recalled Ms. Bandy "yelling" that "it hurt" once, but that he had patients communicate with him similarly during caesarian births. He "clamped the cord," handed the baby to the newborn intensive care staff, then finished the delivery and surgical procedure.

Dr. Hodgson and the operating room team "were upset" after the event and met for a debrief. During the debrief, Dr. Hodgson lamented, "I just assaulted that patient," and admitted that he had never performed a caesarian delivery without anesthesia or using only lidocaine. Dr. Baig was not included in the debrief but contacted Dr. Hodgson a few days later to discuss the situation.[9]

---

[8] Although we review the facts regarding the instruction in best light to Dr. Baig on appeal, we note that Ms. Bandy's evidence, in best light for her, suggested that Dr. Baig was not needed in another operating room and that he did not arrive as quickly as he should have.

[9] Jessica Webb, a registered nurse and the director of women's and children's services at the Reston Hospital Center on the date of Ms. Bandy's delivery, testified that she was not at work on August 15, 2021. She arrived at the hospital around 7:00 p.m. in response to a text

According to Dr. Hodgson's testimony, Ms. Bandy had an uncomplicated post-operative and postpartum course and the baby's Apgar[10] scores of 8 and 9 were "great." Ultimately, in her complaint, Ms. Bandy alleged that Dr. Baig caused her physical pain and emotional distress by, among other things, "fail[ing] to timely and properly administer anesthesia services."[11]

*The Superseding Cause Instruction Issue*

After both sides had rested, the parties and the trial court addressed instructions outside the jury's presence. Dr. Baig offered Jury Instruction U, a model jury instruction, which read:

> A superseding cause is an independent event, not reasonably foreseeable, that completely breaks the connection between the defendant's negligent act and the plaintiff's injury. A superseding cause breaks the chain of events so that the defendant's original negligent act is not a proximate cause of the plaintiff's injury in the slightest degree.

Ms. Bandy argued that including jury instructions on causation would "distract[] the jury" and "cause[] them to presume that there could be a superseding cause, which has never been alleged." Dr. Baig countered that the instruction was a correct statement of law and supported by the evidence and that he had the right to present a defense and argue that Dr. Hodgson's unforeseeable actions constituted a superseding cause. The trial court denied the instruction,

message from the charge nurse. Webb spoke with the nurses involved with the delivery to "make sure that they were good to make it through the rest of the shifts" and to provide emotional support because "they were upset." Webb acknowledged that she had not asked Dr. Baig to attend the post-delivery debrief, then clarified that the event was not a debrief. She provided emotional support for Dr. Hodgson because "he was distressed" and said that "that" had never happened to him. Webb also confirmed that none of the nurses had trouble communicating with Dr. Baig that day.

[10] Apgar scores are evaluated immediately after birth and 5 minutes after birth. The total score evaluates the newborn's overall condition at birth assessing skin color, heart rate, muscle tone, breathing rate and effort, and reflexive grimace response. The scale ranges from 0 to 10, with 10 being the highest score possible.

[11] She also alleged that staffing deficiencies failed to ensure "that necessary medical providers were available for" her care.

- 6 -

finding that it "thought the instruction [was] confusing, because it . . . would imply that . . .
Dr. Hodgson's decision to proceed with the C-section . . . is a not reasonably foreseeable incident
in this case." The trial court continued, the C-section was "going to happen," "was going to be
necessary," and on that basis, determined that the "instruction does [not] do anything other than
create[] confusion for the jury." Further, the trial court, citing *Kellerman v. McDonough*, 278
Va. 478, 494 (2009), stated that "not every intervening cause is a superseding cause." Thus, the
instruction was refused.

*Evidentiary Disputes at Trial*

*Cross-Examination on Bias Excluded*

Dr. Hodgson testified both as a treating physician and as an expert on behalf of plaintiff
in this trial. On cross-examination, defense counsel broached the subject of malpractice actions
against Dr. Hodgson and Ms. Bandy immediately objected. During a sidebar outside the
presence of the jury, Dr. Baig proffered that Dr. Hodgson had "settled two [malpractice] cases
within five years and the board of medicine states that if you settle three cases within ten years, it
automatically triggers a competency evaluation." Dr. Baig argued that the circumstances
provided Dr. Hodgson a "profound motivation to do what he could to avoid a lawsuit in this
case." Ms. Bandy objected that this evidence was unfairly prejudicial and of no probative value.
The trial court sustained Ms. Bandy's objection, finding the line of questioning "invites unfair
prejudice" and noting that it "[didn't] have any support" that the proffered cross-examination
was appropriate. The trial court admonished the jury "to disregard the last question and any
answer that may have been given."

*Admission of Exhibits 10 and 11: Surgery Schedules*

Dr. Baig testified at trial that he was engaged in direct patient care when he received the
first call at 6:43 p.m. In his deposition, however, Dr. Baig was more specific; he said he was

providing anesthesia during an operation when he received the first call. Plaintiff's counsel argued Dr. Baig's explanation of his whereabouts was not credible. In support of that argument, plaintiff introduced two documents that were purported to be surgery schedules (Plaintiff's Exhibits 10 and 11). Plaintiff's counsel used these surgery schedules to argue that Dr. Baig's last operating room case ended several hours before he was called to come for Ms. Bandy's C-section. Defense counsel objected to Exhibits 10 and 11 on the grounds that a proper foundation had not been laid. The trial court overruled those objections and admitted the exhibits.

*Exclusion of Guidelines on the Appropriate 30-minute Window Between Deciding to Perform a C-section and Incision*

A final evidentiary issue in the case involved whether guidelines issued by the American College of Obstetricians and Gynecologists (ACOG) informed the standard of care. These guidelines arguably helped establish that the standard of care allows a 30-minute window between when the obstetrician decides an emergency caesarean section is needed until the first incision of the operation. This time period is commonly referred to as "decision to incision." Nearly every expert witness discussed the "decision to incision" timeframe in some capacity.[12] The trial court refused to allow defense expert, Dr. Oleska, an anesthesiologist, to read from a 2006 ACOG article, which was the genesis of the standard, based on his area of practice. Dr. Baig, again, asserts error.

---

[12] The ACOG standard is 30 minutes from the time the obstetrician decides to perform a caesarian delivery to the initial incision. There was testimony that the 30-minute response time is also used in "all emergency surgeries" at level one or two trauma centers. It is also the Reston Hospital Center's policy. Further, the trauma center manual for Virginia requires a level two trauma center to have a 30-minute response time for the physician to be ready to make the incision.

ANALYSIS

*I.  The Trial Court Erred in Failing to Instruct the Jury on Superseding Cause*

    *A.  Standard of Review*

"One of a trial court's most important responsibilities is to ensure that a jury is properly instructed." *Emergency Physicians of Tidewater, PLC v. Hanger*, 303 Va. 77, 88 (2024). "A litigant is entitled to jury instructions supporting his . . . theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law." *Id.* (quoting *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004)).

"In a civil trial, the burden is on the parties to furnish the trial court with proper and appropriate instructions that address their respective theories of the case." *Bon Secours-Depaul Med. Ctr., Inc. v. Rogakos-Russell*, ___ Va. ___, ____ (Jan. 2, 2025) (quoting *Honsinger v. Egan*, 266 Va. 269, 275 (2003)). If an instruction on a proper theory of the case (which is not otherwise presented to the jury) "finds any support in credible evidence, its refusal is reversible error," and it is "immaterial that the jury could have reached contrary conclusions." *Schlimmer*, 268 Va. at 78.

> When a trial court refuses to give an instruction proffered by a party that is a correct statement of law and which is supported by adequate evidence in the record, this action, *without more*, is sufficient to preserve for appeal the issue of whether the trial court erred in refusing the instruction.

*Hanger*, 303 Va. at 87 (quoting *Commonwealth v. Cary*, 271 Va. 87, 98 (2006)).

The purpose of appellate review of jury instructions is "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Dorman v. State Indus., Inc.*, 292 Va. 111, 125 (2016) (quoting *Cain v. Lee*, 290 Va. 129, 134 (2015)). "[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Id.* (alteration in original) (quoting *Lawlor v. Commonwealth*, 285 Va.

187, 228 (2013)). "A trial court's decision whether to grant or refuse a proposed jury instruction is generally subject to appellate review for abuse of discretion." *Rodrigue v. Butts-Franklin*, 79 Va. App. 645, 653 (2024) (quoting *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017)). However, a mistake of law constitutes an abuse of discretion. *Coffman v. Commonwealth*, 67 Va. App. 163, 166 (2017). And the Court "review[s] de novo whether a jury instruction accurately states the law." *RGR, LLC* v. *Settle*, 288 Va. 260, 275 (2014).

On appeal, Dr. Baig argues that the trial court erred when it denied the jury instruction on superseding cause because the instruction was supported by more than a scintilla of evidence and it was a correct statement of the law. Ms. Bandy counters that the proffered instruction, while a correct statement of the law, was properly refused because it was not supported by the evidence. Specifically, Ms. Bandy contends that Dr. Hodgson's actions were reasonably foreseeable. Ms. Bandy also asserts that Dr. Baig's own negligence supports the trial court's refusal to give the instruction. We agree with Dr. Baig that the trial court erred by refusing the superseding cause instruction under the facts of this case.

### B. There was More than a Scintilla of Evidence that the Events in the Operating Room were Unforeseeable and Unprecedented

"Issues of negligence and proximate causation ordinarily are questions of fact for the jury's determination." *See, e.g.*, *Jenkins v. Payne*, 251 Va. 122, 128 (1996). "A court decides these issues only when reasonable persons could not differ." *Dorman*, 292 Va. at 122 (quoting *Atkinson v. Scheer*, 256 Va. 448, 453-54 (1998)). "The proximate cause of an event is that act or omission which, in natural and continuing sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Id.* (quoting *Kellerman*, 278 Va. at 493). "Under Virginia law, 'the extraordinary manner in which harm occurs may prevent the primary actor's conduct from being the proximate cause of an event.'" *Id.* (quoting *Banks v. City of Richmond*, 232 Va. 130, 137 (1986)). "Thus, even if the primary

- 10 -

actor is the 'but for' cause of an injury, an action that is so highly extraordinary as to be unforeseeable may serve to cut off legal causation." *Id.*

"A superseding cause occurs only when an intervening act so entirely supplants the operation of the initial tortfeasor's negligence that the intervening act alone, without any contributing negligence by the initial tortfeasor in the slightest degree, causes the injury." *Williams v. Joynes*, 278 Va. 57, 63 (2009); *see also* Model Jury Instrs.—Civ. No. 5.010 (A superseding cause is "an independent event, not foreseeable, that completely breaks the connection between the defendant's negligent act and the plaintiff's injury."). A "superseding cause of an injury 'constitutes a new effective cause and operates independently of any other act, making it and only it the proximate cause of injury.'" *Dorman*, 292 Va. at 123 (quoting *Maroulis v. Elliott*, 207 Va. 503, 511 (1966)).[13]

> In other words, even if a defendant is, in fact, "negligent," and his "negligence created a situation of potential danger," if an unforeseeable "independent intervening act" ultimately "brought about the accident," then "the situation of danger created by the defendant's negligence [becomes] merely a circumstance of the accident but not a proximate cause" of the accident.

*Id.* at 122 (alteration in original) (quoting *Chereskin v. Turkoglu*, 235 Va. 448, 450 (1988)).

Moreover, "[a]n event may have more than one proximate cause and, under certain circumstances, a proximate cause may also be a superseding cause that severs the link of

---

[13] In *Dorman*, the Supreme Court held that the trial court properly allowed the superseding cause instruction because "the defendant was entitled to put on a defense" that included an alternative theory of causation. 292 Va. at 123. The plaintiff alleged that the design of an atmospheric water heater was unreasonably dangerous and unfit for the purpose for which it was intended. *Id.* The defendant put on evidence that even if it was negligent, any danger posed by the design could have been "alleviated by proper installation and maintenance." *Id.* at 124. Thus, one of the defenses in *Dorman* included that the independent and allegedly unforeseeable act of improper installation and maintenance of the heater was a superseding cause of the injuries. The *Dorman* Court held that the defendant was entitled to present such a defense and, because there was evidence from which the jury could have found that defendant's alleged negligence was superseded, the trial court did not abuse its discretion in admitting evidence of superseding causation. *Id.*

- 11 -

proximate causation between the initial negligent act and the resulting harm, thereby relieving the initial tortfeasor of liability." *Williams*, 278 Va. at 63.

An example of this principle can be seen in *Banks v. City of Richmond*, where an apartment building maintenance man, attempting to find the source of the smell of gas emanating from a tenant's oven, lit a cigarette lighter to look inside the oven, causing an explosion. It was held that the maintenance man's conduct was so "highly extraordinary" that it was a superseding cause, relieving the city of liability for failing to turn off the gas at the meter. 232 Va. at 136. In fact, the *Banks* Court characterized the City's failure to turn off the gas at the meter as "nothing more than a mere circumstance of the explosion." *Id.*; *see also Huffman v. Sorenson*, 194 Va. 932, 939 (1953).

Dr. Baig's proffered Jury Instruction U correctly stated the law. Our inquiry, accordingly, is whether more than a scintilla of evidence supported the instruction. The record reveals that a nurse called Dr. Baig at 6:43 p.m. to report the vacuum-assisted delivery attempts, and again around 6:47 p.m. to inform of the decision to deliver the baby by C-section after the fourth vacuum-assisted delivery attempt was unsuccessful; Ms. Bandy was then moved to the operating room at 6:49 p.m. Evidence was provided that the fetal heartbeat levels were improving after the cessation of vacuum-assisted procedures and that Dr. Baig reported being two to three minutes away at 6:52 p.m.

The evidence before the jury was that Dr. Hodgson made the initial abdominal incision for the caesarian delivery at 6:55 p.m. The decision to proceed was based on Dr. Hodgson's interpretation of the fetal heartbeat decelerations. He initiated the procedure despite knowing that Dr. Baig had just spoken with the staff to say he was less than a minute away. In fact, Dr. Baig walked into the operating room at 6:55 p.m. (six minutes after Ms. Bandy's arrival there) and immediately attached monitoring devices to Ms. Bandy—which had not been done by

- 12 -

Dr. Hodgson or at his direction before incision—and anesthetized her using a fast-acting medication. Even after Dr. Baig arrived and administered the anesthesia, Dr. Hodgson did not wait the brief period for it to take effect before making an incision into the uterus. Dr. Baig's experts stated that Dr. Hodgson's actions were wholly unforeseeable.

"Negligence carries with it liability for consequences that, in view of the circumstances, could reasonably have been anticipated by a prudent person." *Llewellyn v. White*, 297 Va. 588, 597 (2019) (quoting *Interim Pers. of Cent. Va., Inc. v. Messer*, 263 Va. 435, 442 (2002)). An intervening act, however, need not be negligent for a superseding cause to exist; the threshold is whether the intervening act was reasonably foreseeable or unforeseeable. *See Dorman*, 292 Va. at 122; *cf. Jefferson Hosp. v. Van Lear*, 186 Va. 74, 82 (1947) ("An intervening cause will not be deemed to have broken the causal connection if the intervening cause was foreseen or reasonably might have been foreseen by the wrongdoer.").

Here, viewing the evidence in the light most favorable to the proponent of the refused instruction, there was ample evidence that performing a caesarian delivery without anesthesia was not reasonably foreseeable. Dr. Hodgson, himself, testified that he had never begun a caesarian delivery without anesthesia present. Indeed, Dr. Gutman (Ms. Bandy's own expert) stated:

> I've never encountered a C-section being done under local anesthesia by the surgeon. That is essentially virtually a never event.

Neither of the expert anesthesiologists who testified at trial had ever known an obstetrician to begin the operation before anesthesia was present. The events in the delivery room were so unsettling that staff were called in to give emotional support to nurses involved in the delivery because "they were upset."

The decision to begin the surgical procedure was Dr. Hodgson's alone, and the evidence —viewing it in the light most favorable to Dr. Baig—was that the anesthesiologist had been caring for another patient but was now headed to Ms. Bandy and was only seconds away when Dr. Hodgson decided to proceed with a C-section. Similarly, competent evidence also suggested that no genuine emergency existed to require such a drastic course.

Under these circumstances, we find that the trial court erred in refusing to instruct the jury on superseding cause, so that the jury—as the factfinder—could assess the factual questions related to causation and whether Dr. Hodgson's actions were reasonably foreseeable. *See Schlimmer*, 268 Va. at 78 ("A litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law."). Under the circumstances of this case, we hold that the jury was not properly instructed on the law. Accordingly, we reverse the trial court's judgment and remand for a new trial.

### C. We Reject Ms. Bandy's Arguments that the Tendered Instruction was Confusing, that the Events were Foreseeable and that Dr. Baig's Instruction Improperly Asserts Negligence Against "the Empty Chair"

The trial court denied the superseding cause instruction tendered by Dr. Baig, finding that "the instruction [was] confusing, because it . . . would imply that . . . Dr. Hodgson's decision to proceed with the C-section . . . is a not reasonably foreseeable incident in this case." The trial court continued, the C-section was "going to happen," "was going to be necessary," and determined that the "instruction does [not] do anything other than create[] confusion for the jury."

Ms. Bandy argues, in addition to claims that the C-section was entirely foreseeable, that Dr. Baig's instruction was an improper means of asserting negligence against other non-defendant doctors. We disagree with the trial court and Ms. Bandy.

- 14 -

First, Ms. Bandy is free to present her foreseeability argument to the jury on remand—but on these facts the actions leading up to the delivery of Ms. Bandy's child could not be deemed foreseeable *as a matter of law*; indeed, multiple witnesses and experts testified that proceeding with a C-section under these conditions, without anesthesia, was unprecedented and that they had never seen such a decision before in their entire careers. Defense experts further noted that the decision to begin the C-section immediately was also unnecessary—as, in their view, there was no looming emergency.

Moreover, Ms. Bandy's suggestion that Dr. Baig was attempting to assert negligence against Dr. Hodgson is misplaced. The defense did not allege negligence against any other doctor. It is well-settled that an intervening act can be a superseding cause even in the absence of negligence. The Restatement (Second) of Torts § 440 provides: "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." There is no requirement that the intervening act be negligent for a superseding cause to exist; rather, a defendant must establish that the intervening act in question was not foreseen or reasonably foreseeable. *See Jefferson Hosp.*, 186 Va. at 82. "Ultimately, liability in these intervening-third-party situations seems to depend, not upon the characterization of the intervening act as 'independent,' but upon whether the intervening act is foreseeable." 1 Personal Injury Law in Virginia 4.4 (explaining that an intervening act will not excuse the first wrongdoer if the act should have been foreseen, "regardless of whether the intervening act was negligent, intentional, or an act of God"). In sum, it is the foreseeability of the intervening act that determines whether it severs the causal nexus between the defendant's negligent act and the injuries.

Finally, the instruction was a model instruction supported by evidence. *See* Va. Model Jury Instrs.—Civ. No. 5.010. While the concepts underlying a superseding cause defense are not necessarily intuitive, giving a proper model instruction supported by the evidence cannot be deemed "confusing" here. The trial court and Ms. Bandy assert that the confusion relates to the decision to do a C-section (which they suggest was inevitable). However, it is not merely the decision to perform a C-section that is challenged as a superseding cause: it is the decision to perform a C-section without anesthesia, upon very short notice, while knowing the anesthesiologist had only recently been called, was close by, and would be in the operating room momentarily. Ms. Bandy's own expert framed this as a "never event." We conclude that there was sufficient evidence to support an instruction asking the factfinder to determine whether a superseding cause extinguished negligence by Dr. Baig, if any.[14]

## II. The Trial Court Erred in Ruling that Cross-Examination Relating to Bias was not Probative—and that the Court did not have "Any Support" that the Bias Line of Questioning was "Appropriate"

When a judgment is reversed on a specific ground and remanded for a new trial—and assignments of error remain that relate to evidentiary issues that are likely to recur in the new trial—it is appropriate for the appellate court to address the issues that will likely arise in the subsequent trial. *Harman v. Honeywell Int'l, Inc.*, 288 Va. 84, 95-96 (2014) (considering evidentiary matters that likely would arise on remand where the judgment was reversed on other grounds); *Cain*, 290 Va. at 136 (same). By corollary, where an evidentiary issue is unlikely to arise in the same context on remand, the appellate court should decline to reach the sidetrack issue and avoid rendering, essentially, an advisory opinion. *See Harman*, 288 Va. at 95-96.

---

[14] The instruction error, in our view, tainted the jury's liability analysis, and we remand for a new trial on all issues. This outcome is further influenced by our rejection of the trial court's premise that it was inappropriate to allow defense counsel to cross-examine Dr. Hodgson about his potential bias. This evidentiary issue will be further discussed below.

Here, it seems that the issue of cross-examining Dr. Hodgson for bias is almost certain to recur in a retrial. Thus, we must address it—and we find that the trial court erred in its analysis of the question.

### A. Standard of Review

We "review a trial court's decision to exclude evidence for an abuse of discretion[.]" *Kimble v. Carey*, 279 Va. 652, 662 (2010). "That discretion, however, is not without limitations, and a litigant has a right to establish that a witness is biased." *Sawyer v. Comerci*, 264 Va. 68, 78 (2002). Our Supreme Court "has consistently stated that 'cross-examination on a matter relevant to the litigation and put in issue by an adversary's witness during a [trial] is not a privilege but an absolute right.'" *Velocity Express Mid-Atlantic v. Hugen*, 266 Va. 188, 204 (2003) (alteration in original) (quoting *Basham v. Terry*, 199 Va. 817, 824 (1958)).

### B. Evidence of Bias and "Self-Protection" are Probative

"The opportunity of a party to show bias of a witness is among the core goals of cross-examination[.]" Charles E. Friend, *The Law of Evidence in Virginia* § 11-8 (8th ed. 2023). "The bias of a witness, like prejudice and relationship, is not a collateral matter. The bias of a witness is *always* a relevant subject of inquiry when confined to ascertaining previous relationship, feeling and conduct of the witness." *Sawyer*, 264 Va. at 78 (emphasis added) (quoting *Henning v. Thomas*, 235 Va. 181, 188, (1988)).[15] "[O]n cross-examination great

---

[15] In *Henning*, our Supreme Court, reversing a judgment based on the improper restriction of cross-examination, stated, "[t]he trial court's ruling prevented defendants from doing precisely what defendants had a right to do." 235 Va. at 188. The Court went on to explain that "[t]he defendant doctors were entitled to attempt to persuade the jury that Dr. Culley [the plaintiff's expert witness] was a 'doctor for hire,' who was part of a nationwide group that offered themselves as witnesses, on behalf of medical malpractice plaintiffs." *Id.* Indeed, "[o]nce the jury was made aware of this information it was for the jury to decide what weight, if any, to give to Culley's testimony. This was a classic case of an effort to establish bias, prejudice, or relationship." *Id.* at 189. The Court found that "[t]he trial court went too far when it limited defendants' cross examination to the bare question whether Dr. Culley was being paid to testify." *Id.*

latitude is allowed and . . . the general rule is that anything tending to show bias on the part of a witness may be drawn out." *Id.* (alterations in original); *see also Gross v. Stuart*, 297 Va. 769, 771 (2019) (holding trial court did not abuse its discretion by permitting cross-examination of an expert witness regarding adverse findings in a professional disciplinary proceeding).

Here, Ms. Bandy presented Dr. Hodgson as a "treating physician" and obstetrician hospitalist. Ms. Bandy asserted that he was "an important witness in this case" and that his "educational background, his experience, his qualifications are important and relevant to this case." Subsequently, Ms. Bandy asked the trial court to admit Dr. Hodgson as an expert in obstetrics. Dr. Baig objected, and Ms. Bandy's counsel stated that he "was designated as an expert in our expert designation." The trial court then recognized Dr. Hodgson as an expert in obstetrics and gynecology.

On cross-examination, Dr. Baig's counsel confirmed that Dr. Hodgson was testifying as an expert witness. Counsel then asked about Dr. Hodgson's "two other medical malpractice cases in 2014 and 2019." Ms. Bandy objected, characterizing the question as "a low blow," highly prejudicial, and of "no probative value." Dr. Baig's counsel responded that Dr. Hodgson was testifying as an expert witness and the question went to "his credibility and his bias." Dr. Baig then proffered, out of the presence of the jury, that Dr. Hodgson "had settled two [medical malpractice] cases within five years and the board of medicine states if you settle three cases within ten years, it automatically triggers a competency evaluation"; thus, Dr. Baig argued, Dr. Hodgson had a "profound motivation to do what he could to avoid a lawsuit in this case." The trial court ultimately ruled that asking Dr. Hodgson the medical malpractice question "invite[d] unfair prejudice in the circumstances." It further ruled that it did not have "any support that [the line of questioning was] appropriate" and sustained the objection.

We find that the trial court erred in ruling that evidence of Dr. Hodgson's possible bias and possible self-protection was inappropriate and lacked probative value. First, there was a classic battle of the experts in this case. On the one hand, Ms. Bandy's expert, Dr. Hodgson, testified that the factors that he observed during labor required him to begin the C-section without proper anesthesia. Indeed, without Dr. Hodgson's testimony that it was necessary to begin the C-section without anesthesia present, it is questionable whether the claim against the anesthesiologist could have been established. On the other hand, defense experts testified that Dr. Hodgson's decision was "absolutely not" necessary. In fact, Dr. Hodgson and the defense experts disagreed about much of the data relevant to Dr. Hodgson's decision to proceed without anesthesia: including whether a series of pre-caesarean interventions could have addressed the deceleration; whether use of a vacuum was indicated after only two pushes; whether the fetal heart rate at the time of the decision actually indicated a recovery; whether the use of a vacuum causes deceleration; and whether a fetal heart rate of 90 BPM is an emergency. The rift between the experts on such significant issues made any evidence that would help the jury determine who to believe highly probative.

Virgina law protects the ability to draw out evidence of an expert's bias. Expert compensation, for example, is often explored for this purpose. *See Sawyer*, 264 Va. at 79-80 (holding trial court abused its discretion by not allowing plaintiff to cross defendant's expert witness on his previous testimony for the defendant and his compensation); *Henning*, 235 Va. at 188-89 (holding trial court abused its discretion by restricting defendant's ability to cross expert witness about being a "professional" witness).

Moreover, Dr. Hodgson also testified to material facts, and his rendition of events was, again, at odds with defense witnesses on various issues. Surely, it was probative for Dr. Baig to suggest that Dr. Hodgson had an interest in deflecting attention from his own decisions and

casting doubt on Dr. Baig to avoid a competency review. It was, similarly, appropriate to ask the jury to weigh whether the witness's memory and opinions were more self-protective than objectively accurate.

In short, the issue of whether Dr. Hodgson's version and analysis of events was skewed by his own self-interest was a probative line of inquiry. *See Sawyer*, 264 Va. at 78 ("[T]he general rule is that anything tending to show bias on the part of a witness may be drawn out.").

### C. We Leave the Precise Balancing of Probative Value and Prejudice to the Trial Court on Remand

While the trial court erred in failing to recognize the probative value of Dr. Baig's cross-examination relating to bias and self-interest, we leave the analysis of balancing probative value and prejudice under Rule of Evidence 2:403 to the trial court on remand. As Justice McCullough wrote in *Gross*, concurring:

> The credibility of an expert is often of paramount significance. The fact that an expert has been subjected to professional discipline can be more or less relevant to the expert's credibility. An unbounded approach to impeachment in such matters, however, could unfairly prejudice a party and distract the jury. To guard against these dangers, trial judges should exercise their broad discretion to restrict, where appropriate, the scope of this type of impeachment.

297 Va. at 732 (citing *Lombard v. Rohrbaugh*, 262 Va. 484, 492 (2001)). Thus, while we note that the cross-examination Dr. Baig sought to undertake below was probative under these facts, on remand this does not amount to a blank check to denigrate Dr. Hodgson's reputation or status. On retrial, cross-examination as to bias generally should be permitted, subject to the rigors of Rule 2:403.[16]

---

[16] Evidence of a witness's bias is generally highly probative on cross-examination. *See Sawyer*, 264 Va. at 78. But even highly probative evidence can be excluded if its probative value is "substantially outweighed by . . . the danger of unfair prejudice." Va. R. Evid. 2:403(a). While all probative direct evidence will have some prejudicial effect on the opposing party, "'*unfair* prejudice' refers to the tendency of some proof to inflame the passions of the trier of

Ultimately, the trial court remains the gatekeeper in addressing how to balance any unfair prejudice against the probative value of the evidence. The court erred below in finding that the line of questioning had no probative value and was an inappropriate area of inquiry. *See Gross*, 297 Va. at 776 n.10.[17]

CONCLUSION

The trial court erred in refusing to grant Dr. Baig's requested superseding cause instruction. This instruction error necessitates reversal and a new trial. On remand, questioning related to Dr. Hodgson's bias should be treated as probative evidence and cross-examination on this topic presents an appropriate line of questioning, subject to the constraints of Rule 2:403.

*Reversed and remanded.*

---

fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Lee v. Spoden*, 290 Va. 235, 251 (2015) (emphasis added). Thus, when it comes to the cross-examination of a non-party witness to show bias or self-interest, the trial court still must consider the danger of unfair prejudice when performing the Rule 2:403 balancing test. Litigants generally have an "absolute right" to conduct cross-examination "on a matter relevant to the litigation and put in issue by an adversary's witness during a [trial]." *Hugen*, 266 Va. at 204 (alteration in original) (quoting *Basham*, 199 Va. at 824). They do not have a right to deliberately derogate a witness in order to "lure the factfinder into declaring [liability] on a ground different from proof specific to the [case elements]." *Lee*, 290 Va. at 251 (second alteration in original) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

[17] Our resolution of the foregoing issues "renders it unnecessary to address" the remaining two assignments of error alleging that the trial court erred in (1) admitting business records without first complying with Rule of Evidence 2:803 and (2) preventing Dr. Baig's expert witness from reading medical literature into the record solely based on the expert's specialty. *See Cain*, 290 Va. at 136 (evidentiary issues unlikely to arise in the same context on remand should not be resolved). We cannot say that these issues are likely to reoccur on remand. A foundation that is beyond dispute may be laid for the challenged exhibits on retrial; an expert in the field of obstetrics may be called upon to read the ACOG standard in a second trial. As in *Emergency Physicians*, "it is uncertain how the proceedings will unfold. The approach and strategy to the litigation may change." *Emergency Physicians*, 303 Va. at 89.